THE STATE, EX REL. MOSSER CONSTRUCTION, INC., APPELLANT,
*v.* INDUSTRIAL COMMISSION OF OHIO, APPELLEE, ET AL.

[Cite as *State, ex rel. Mosser Constr., Inc., v. Indus. Comm.* (1991), 61 Ohio St.3d 445.]

(No. 90–280—Submitted March 19, 1991—Decided August 14, 1991.)

446

*Arter & Hadden, Douglas M. Bricker* and *Judith E. Trail,* for appellant.

*Lee I. Fisher,* Attorney General, *Merl H. Wayman, Michael L. Squillace* and *Jetta Mencer,* for appellee.

*Per Curiam.* Ohio Adm.Code 4121:1–3–04(D)(1) states in part:

"Floor openings shall be guarded by a standard guard railing and toeboard or cover.   * * *"

Appellant admits that the fatal floor opening was unprotected. It instead argues that: (1) appellant could not have satisfied Ohio Adm.Code 4121:1–3–04(D)(1) without violating another specific safety requirement, and (2) the commission improperly interpreted Ohio Adm.Code 4121:1–3–04(D)(1). Neither challenge has merit.

Appellant asserts that immediate placement of adequate protection around or over the newly created opening could not have been accomplished without placing employees beneath the suspended pipe. This, appellant contends, would have violated either Ohio Adm.Code 4121:1–3–07(F) ("[n]o employee shall be permitted to pass under or be under loads handled by * * * hoists * * * ") or 4121:1–5–15(D) (employees shall not be required to work or pass under suspended loads). Appellant thus claims that it should not be penalized for choosing to comply with one specific safety requirement at the inevitable expense of another.

We are unpersuaded by appellant's assertion. Again, the commission found that appellant could have satisfied the relevant provision without violating another. When asked by the staff hearing officer why a guardrail wasn't constructed around the pipe before it was removed, negating the need to place workers under the suspended pipe, Besgrove testified only that "there was very limited room up there * * * " and that "the guardrail was probably not thought of and it would have restricted us a little bit getting the pipe out of there * * *." While the method suggested by the hearing officer may have been inconvenient, it was not impossible.

Appellant cites *State, ex rel. Harris, v. Indus. Comm.* (1984), 12 Ohio St.3d 152, 153, 12 OBR 223, 224, 465 N.E.2d 1286, 1288, in which this court stated that "where the application of * * * [a specific safety requirement] to a unique factual situation gives rise to a patently illogical result, common sense should prevail. * * * " Appellant claims that it is "patently illogical" to require an employer to guard a hole before it is created. We disagree. Where the only safe way to guard a floor opening is to implement precautions beforehand, it is not "patently illogical" for the commission to find that an employer's failure to do so constituted a VSSR.

In a related contention, appellant claims that the commission improperly construed Ohio Adm.Code 4121:1–3–04(D)(1) as requiring protection before an opening was created. This, too, is unpersuasive. The commission did not penalize appellant for failing to guard an *anticipated* opening. It penalized appellant for admittedly failing to guard an *existing* hole. The staff hearing officer's reference to the erection of a guardrail before the pipe was removed was a response to the appellant's claim that the hole could not have been guarded without violating a different specific safety requirement.

The factual determination of a specific safety rule violation rests with the commission. *State, ex rel. A–F Industries, v. Indus. Comm.* (1986), 26 Ohio St.3d 136, 26 OBR 117, 497 N.E.2d 90. In the case at bar, the appellant concedes that it did not comply with Ohio Adm.Code 4121:1–3–04(D)(1). Besgrove's testimony is "some evidence" supporting the commission's conclusion that compliance was not impossible. Practical inconvenience does not excuse noncompliance with a specific safety requirement.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

SWEENEY, DOUGLAS, H. BROWN and RESNICK, JJ., concur.

MOYER, C.J., HOLMES and WRIGHT, JJ., dissent.

HOLMES, J., dissenting. The majority opinion errs both in the review of the facts that were before the commission, and the appropriate law to be applied to these facts. First, we are dealing here with the issue of whether or not a penalty should have been levied against this employer and are not reviewing a workers' compensation award for injury or death of the employee—these have already been applied for and granted. The authority to award additional compensation to an employee injured or killed as a result of an employer's alleged violation of a specific safety requirement arises out of Section 35, Article II, Ohio Constitution. This court held, in *State, ex rel. Trydle, v. Indus. Comm.* (1972), 32 Ohio St.2d 257, 61 O.O.2d 488, 291 N.E.2d 748, paragraph one of the syllabus, that:

"The term 'specific requirement' * * * does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission, and which are of a character plainly to apprise an employer of his legal obligation toward his employees."

In that an award for a violation of a specific safety requirement is deemed a penalty, the safety requirement must be strictly construed, with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. *State, ex rel. Burton, v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 545 N.E.2d 1216.

The only specific safety requirement alleged to have been violated here by the employer, Mosser, is Ohio Adm.Code 4121:1–3–04(D)(1), which provides:

"Openings.

"(1) Floor openings.

"Floor openings shall be guarded by a standard guard railing and toeboard or cover. Standard guard railing and toeboard shall be provided on all exposed sides except at entrances to stairways."

This specific safety requirement, read in a reasonable sense, only requires that an existing opening in a floor area, such as the work platform involved here, must be guarded by a guardrail or cover. To obtain the full picture of the work area concerned here, and the relationship of the deceased to such specific area, I shall first set forth a drawing of the area involved, Mosser's Exhibit (A), *infra*, at 452, 575 N.E.2d at 199, and then review the facts before the commission hearing officer.

The particular job out of which this claim arose involved the removal of a section of vertical ductwork which measured four feet in diameter and was approximately eight feet in length. The ductwork in question penetrated a work platform that was located approximately thirty feet above the floor of the burner building. Martin Marietta employees were working on the floor of the burner building beneath the platform. The section of ductwork to be removed was located between the point where it penetrated the work platform and the point where it penetrated the roof structure, which was approximately eight to ten feet above the work platform.

The work platform itself was approximately eight feet by ten feet with the duct penetration located toward one corner. There was also an elevator projecting through the work platform in another location. At the time of the accident, there was miscellaneous material, including pieces of duct similar to the duct Mosser was to remove, located upon the platform. There was a guardrail around the perimeter of the work platform. It seems that for the work purposes of Martin Marietta employees, they had no reason to be on or use this platform.

In order to remove the duct, Mosser was required to cut through it with a torch. Because flanges at the work platform level prevented the duct from being lowered directly to the floor below, the employer was required to raise the duct approximately forty-two inches to clear the platform guardrail. The plan was then to swing the duct out beyond the guardrail and lower it down to the floor below in one continuous operation. Once the hazard presented by the suspended load had been abated, the opening created by removal of the duct was to be covered.

Mosser assigned two employees, Robert D. Besgrove, Jr., and the decedent, to remove the section of duct. Besgrove was the working superintendent and the decedent was his assistant. Besgrove and the decedent were both iron workers. Besgrove had worked for Mosser for twenty-five years, and had served twenty years as a superintendent. Besgrove was familiar with the

plant as he had worked there four to five years, in part doing much the same work that he and the decedent were performing at the time of the accident. Decedent had been working as an iron worker for Mosser for approximately two years. Decedent had been working with Besgrove on a consistent basis for a year prior to the accident.

In order to remove the duct, Besgrove and the decedent had taken their equipment and tools up to the working platform. The equipment and tools necessary to perform the removal consisted of an oxygen-acetylene torch including two tanks and fifty feet of hose, one thirty-foot chainfall, one come-along with fifteen feet of chain, various shackles and chokers, and a fourteen-foot extension ladder. Plywood and planking to cover the hole once the duct had been removed and lowered to the floor were to be hoisted up through the hole after the duct had been lowered to the floor. The plywood and planking were not brought up at the time because of the limited working space on the platform. Moreover, the ladder had to be set in various positions around the duct so as to allow the workers to cut the duct loose with the acetylene torch. While Besgrove was working on the duct, the ladder projected four feet out from the base of the duct for stability.

Once the duct had been cut loose with the torch, Besgrove and the decedent pulled the duct up with the come-along which had been attached to an overhead girder and, in one continuous motion, twisted the duct so that it was hanging out over the guardrail at a fifteen to twenty degree angle. The section of duct weighed approximately one thousand pounds. At that point, Besgrove instructed the decedent to stand at a point approximately six feet away from the hole just created by the removal of the duct to monitor the duct as it was lowered and to watch for and warn any Martin Marietta employee who might unexpectedly walk beneath the suspended load. Besgrove then climbed up the ladder to adjust the rigging and to continue the process of lowering the duct to the floor below. As he was so engaged, Besgrove looked down only to see the decedent falling through the opening created by the duct removal.

Under the unique facts of this case, there was *no* opening in the floor at the time the decedent and Besgrove began to work on the platform, except for the elevator shaft. When the decedent and Besgrove began to cut the section of duct that extended through the platform, there was, in fact, no opening at all that required a guardrail or cover. At the time decedent began working, the duct extended through the floor and completely blocked any opening in the platform. Thus, there was no opening in the floor which required a guardrail or cover as set forth in Ohio Adm.Code 4121:1–3–04(D)(1) until the cut section was actually lifted up by the come-along.

Notwithstanding the limited circumstances in which Ohio Adm.Code 4121:1–3–04(D)(1) mandates that a guardrail or cover be provided (*i.e.*, where a floor opening exists), the Industrial Commission applied a different and previously unannounced standard in finding a violation. Specifically, the commission held that Mosser had violated the subject standard by failing to erect a guardrail around the section of duct before it was lifted out, *i.e.*, before any floor opening had been created.

In its factual findings on which the decision was based, the Industrial Commission stated:

" * * * The Staff Hearing Officer notes that this hearing officer asked superintendent R.D. Besgrove at hearing whether a guardrail could have been install [*sic*] prior to raising of the ductwork creating the opening. * * * [T]he Staff Hearing Officer finds that the employer's failure to have a guardrailing or cover was the direct and proximate cause of the accident which result [*sic*] in decedent's death."

Clearly the imposition and application of such an unannounced and unpublished standard is in direct violation of the mandate of this court that safety requirements be "specific," "definite" and "of a character plainly to apprise an employer of his legal obligations toward his employees." *Trydle, supra,* at syllabus.

Pursuant to the overwhelming weight of authority requiring that safety requirements be strictly construed, Ohio Adm.Code 4121:1–3–04(D)(1) may not now be expanded to require that guardrails or covers be erected or installed even before a floor opening has been created, and the Industrial Commission exceeded its authority in so interpreting the subject section. Since that unreasonably strained construction was the sole basis for finding a violation, the writ of mandamus should be granted.

MOYER, C.J., and WRIGHT, J., concur in the foregoing dissenting opinion.